

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-23-2009

# Donlin v. Philips Lighting

Precedential or Non-Precedential: Precedential

Docket No. 07-4060

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Donlin v. Philips Lighting" (2009). *2009 Decisions.* Paper 1429.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1429

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-4060
No. 07-4081

———

COLLEEN DONLIN,

Appellee,

v.

PHILIPS LIGHTING NORTH AMERICA
CORPORATION
d/b/a
Philips Lighting Company,

Appellant.

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 05-cv-00585)
District Judge: Honorable Richard P. Conaboy

———

Argued November 17, 2008

Before: SCIRICA, *Chief Judge*, FUENTES and
HARDIMAN, *Circuit Judges*.

(Filed: April 23, 2009)

Stephen D. Rhoades (Argued)
Law Offices of Edward P. McNelis
19 Broad Street
Hazelton, PA 18201-0000

Theodore R. Laputka, Jr.
Theodore R. Laputka & Associates
19 East Broad Street
Hazleton, PA 18201
        *Attorneys for Appellee*

David R. Fine (Argued)
Jacqueline E. Bedard
Amy L. Groff
K&L Gates
17 North Second Street
18th Floor, Market Square Plaza
Harrisburg, PA 17101
        *Attorneys for Appellant*

———

OPINION OF THE COURT

———

2

HARDIMAN, *Circuit Judge*.

Colleen Donlin sued Philips Electronics North America Corporation for employment discrimination after it failed to hire her as a full-time employee. The case was tried before a jury and Donlin was awarded $164,850 in compensatory damages. Philips appealed, raising various challenges to liability and damages. Donlin filed a cross-appeal. For the reasons that follow, we will affirm the jury's finding of liability but remand for a new trial on damages.

I.

Philips hired Donlin as a temporary warehouse employee at its Mountaintop, Pennsylvania distribution center in May 2002. Because of fluctuations in demand for Philips's products, the Mountaintop facility occasionally hired temporary employees to fill and prepare orders for shipment. Like many of the temps at the Mountaintop facility, Donlin applied for a full-time position in the plant, but was not hired. After deciding not to hire Donlin as a full-time employee, Philips ended Donlin's temporary assignment in January 2003, citing a decrease in sales volume.

Donlin sued Philips for gender discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.*, seeking compensatory and punitive damages. The District Court granted Philips summary judgment on Donlin's retaliation claim, but her gender discrimination claim proceeded to trial. At the conclusion of Donlin's case-in-chief, Philips moved for judgment as a matter of law, which the

District Court denied. Philips renewed its motion for judgment as a matter of law after putting on its defense. This time, the District Court denied Philips's motion on liability grounds, but granted Philips judgment on Donlin's claim for punitive damages.

The case proceeded to the jury on the issue of liability as well as compensatory damages in the form of back pay and front pay.[1] The jury rendered a verdict in Donlin's favor on liability and recommended $63,050 in back pay and $395,795 in front pay, for a total of $458,845. The jury's advisory verdict on front pay was based on the premise that Donlin would have worked for 25 more years until retirement.

Following post-verdict briefing, the District Court heeded the advice of the jury on the back-pay issue, but modified its front-pay award by reducing it to account for only 10 years of damages, finding that calculating damages for a 25-year period was too speculative. The final front pay award was $101,800, for a total of $164,850 in compensatory damages.

At the conclusion of the proceedings, Philips filed a motion for judgment notwithstanding the verdict, which the District Court denied. Philips now appeals, asserting errors with

---

[1]The jury's role was only advisory on the issue of damages because back pay and front pay are equitable remedies to be determined by the court. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 849-50 (2001); *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 315 (3d Cir. 2006).

4

regard to liability, damages, and attorney's fees, and Donlin cross-appeals. We have jurisdiction under 28 U.S.C. § 1291.

## II.

We begin with Philips's contention that the liability verdict cannot stand because the jury instructions were flawed. Specifically, Philips asserts that the District Court mischaracterized its rationale for deciding not to hire Donlin as a permanent employee. Because Philips objected to the jury instructions at trial, we review this claim for abuse of discretion. *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 180 F.3d 542, 549 (3d Cir. 1999). We must determine whether, taken as a whole, the instruction properly apprised the jury of the issues and the applicable law. *Dressler v. Busch Entm't Corp.*, 143 F.3d 778, 780 (3d Cir. 1998).

In determining liability, the trial court analyzed Donlin's employment discrimination suit under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Donlin first had to make out a prima facie case of discrimination. *Id.* at 802. The burden then shifted to Philips to present a nondiscriminatory reason for declining to hire her. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Donlin then had to demonstrate that the reasons claimed by Philips were pretextual. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Philips contends that the District Court's jury charge distorted step two of the *McDonnell Douglas* framework by mischaracterizing its nondiscriminatory reasons for choosing not

5

to hire Donlin. The District Court's instruction to the jury provided, in relevant part:

> I instruct you . . . that Philips Lighting has given in this case what is generally accepted as a nondiscriminatory reason for its failure to hire Ms. Donlin. They told you that their decision was based on her record of *attendance, production, and accuracy* as compared to all the other applicants that they considered for the same job. I instruct you, members of the jury, that if you disbelieve Philips's explanation for its conduct, then you may – you may not, but you may very well find that Ms. Donlin has proved intentional discrimination.

(emphasis added).

Philips zeroes in on the word "accuracy," claiming that it should not have been included in the instruction because it was not a relevant factor in the company's hiring decision. Because the instructions did not accurately summarize the company's reasons for choosing not to hire Donlin, Philips argues, the jury was invited to find that Philips's rationale for not hiring Donlin was pretextual since Philips never claimed that Donlin was "inaccurate."

Philips tacitly accuses the District Court of pulling the issue of "accuracy" out of thin air, contending that its witnesses consistently described the company's hiring factors as only *attendance, productivity, and quality of work*. This argument is

6

belied by the record. In response to a question regarding which factors were important when hiring a temporary worker for permanent employment, Donlin's shift supervisor, Duane Wright, agreed that the company considered production, attendance, and *accuracy* to be of "paramount importance." Additionally, at various stages of the trial, the jury heard testimony regarding "picking errors," which occurred when an employee failed to correctly collect products for an order; such errors can fairly be described as involving accuracy.

By taking issue with the District Court's use of the word "accuracy," Philips claims reversible error by latching on to one word in a 23-page jury charge. We are not persuaded. We begin by noting that a mistake in a jury instruction constitutes reversible error only if it fails to "fairly and adequately" present the issues in the case without confusing or misleading the jury. *United States v. Ellis*, 156 F.3d 493, 498 n.7 (3d Cir. 1998). We cannot say that the use of the single word "accuracy" so altered the jury's thinking as to give such a misimpression in this case. Indeed, there is a logical connection between an employee's accuracy and her quality of work and productivity. As a temporary warehouse employee, Donlin filled and prepared orders for shipment. If she could not prepare orders accurately, the quality of her work would suffer. To suggest otherwise is overly semantic. Accordingly, we find that the District Court met its responsibility to provide the jury with a clear articulation of the relevant law. *See United States v. Goldblatt*, 813 F.2d 619, 623 (3d Cir. 1987).

The trial judge is permitted considerable latitude to summarize and comment upon the evidence, provided that the

jury is neither confused nor misled. *Am. Home Assur. Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 327 (3d Cir. 1985); *Hickey v. United States*, 208 F.2d 269, 274 (3d Cir. 1953). Jury instructions are to be read as a whole, *United States v. Flores*, 454 F.3d 149, 157 (3d Cir. 2006), and it is wrong to suggest that the word "accuracy" so infected the instructions as to confuse or mislead the jury. Viewing the jury's instructions in their entirety and in context, we find that the District Court did not abuse its discretion. Therefore, we will affirm Donlin's liability verdict against Philips.[2]

---

[2]Though we find in Donlin's favor regarding the liability verdict, we reject her cross-appeal that Philips was amenable to punitive damages. A Title VII plaintiff may recover punitive damages for intentional discrimination where "the complaining party demonstrates that the respondent engaged in . . . discriminatory practices with malice or with reckless indifference to . . . federally protected rights." 42 U.S.C. § 1981a(b)(1); *Le v. Univ. of Pa.*, 321 F.3d 403, 409 (3d Cir. 2003). Though Donlin alleges conclusorily that Philips exhibited deliberate indifference to her federally protected rights by way of pervasive sexual discrimination, record tampering, and destruction of evidence, she failed to present sufficient evidence that Philips acted with malice or reckless indifference. Because no reasonable juror could have returned a verdict assessing punitive damages against Philips, we will affirm the District Court's judgment on this issue.

III.

Having determined that the District Court did not err regarding liability, we turn to the more complicated issue of damages.

A.

As a threshold matter, Philips contends that the District Court's damages analysis was flawed because it rested on the admission of improper testimony. Specifically, Philips avers that the District Court erred under Rule 701 of the Federal Rules of Evidence in allowing Donlin to provide specialized or technical testimony regarding her compensatory damages. As to back pay, the District Court allowed Donlin to testify not only about her actual earnings, but also about her estimated lost earnings and pension benefits. With regard to front pay, Donlin's testimony detailed the number of years she intended to work and the annual salary differential between Philips and the other companies where she was employed. In addition, Donlin estimated her future pension value, performed a probability of death calculation, and reduced her front pay award to its present value.

We review the District Court's evidentiary rulings, including whether opinions are admissible under Rule 701, for abuse of discretion. *See United States v. Leo*, 941 F.2d 181,

9

192-93 (3d Cir. 1991).[3]  However, we will only reverse if we find the District Court's error was not harmless.  *See Becker v. ARCO Chem. Co.*, 207 F.3d 176, 205 (3d Cir. 2000).

> Rule 701 governs opinion testimony by lay witnesses: If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701.

---

[3]Contrary to Donlin's assertion, Philips did not waive this issue in the District Court when it decided not to seek a mistrial during a sidebar.  Philips objected to the introduction of damages evidence that Donlin withheld during discovery, not to the competency of Donlin's testimony.  By agreeing to proceed following the sidebar, Philips waived its objection to Donlin's belated damages calculations, but that does not vitiate its objection to Donlin's testimony on Rule 701 grounds.  Indeed, Philips objected to Donlin's testimony on this ground in both a motion *in limine* and at the conclusion of the first day of the trial.

10

Subsection (c) was added in 2000 to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." FED. R. EVID. 701 advisory committee's notes for the 2000 amendments [hereinafter Notes to 2000 Amendments]; *see also United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) ("The purpose of [subsection (c)] is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702.").[4] As a result, lay testimony must "result[ ] from a process of reasoning familiar in everyday life," as opposed to

---

[4] Rule 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

11

a process "which can be mastered only by specialists in the field."  Notes to 2000 Amendments.

This does not mean that an expert is always necessary whenever the testimony is of a specialized or technical nature. When a lay witness has particularized knowledge by virtue of her experience, she may testify — even if the subject matter is specialized or technical — because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702.  *See* Notes to 2000 Amendments.  At the same time, we have consistently required that lay testimony requiring future projections of a business or operation come from someone who has intimate and thorough knowledge of the business gathered from either a lengthy tenure or a position of authority.  For instance, in *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993), we allowed a company's founder and owner to testify regarding his lost future profits and harm to the value of his business.  *Id.* at 1175. Though the testimony concerned a "specialized" field and involved predictions about future business performance, we found that the witness had adequate personal knowledge in light of his in-depth experience with the business's contracts, operating costs, and competition.  *Id.*; *cf. In re Merritt Logan, Inc.*, 901 F.2d 349, 360 (3d Cir. 1990) (principal shareholder of business properly testified concerning business projections where he was intimately involved with the investments and management of the business); *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980) (company's licensed public accountant was allowed to testify regarding lost profits based on his personal knowledge of company's balance sheets). The Advisory Committee's notes to the 2000 amendment to

12

Rule 701 specifically address *Lightning Lube* and note that its holding remains undisturbed by the amendment.

We have extended *Lightning Lube*'s personal knowledge exception to plaintiffs testifying in employment discrimination suits. In *Maxfield v. Sinclair International*, 766 F.2d 788 (3d Cir. 1985), we allowed a plaintiff alleging age discrimination to testify as to his projected earnings and to reduce those earnings to present value. *Id.* at 797. The facts of *Maxfield* are significantly different from Donlin's case, however, because the plaintiff worked for the defendant company for nearly 40 years. Given his significant employment history, we recognized that Maxfield would be able to base his request for front pay upon his former earnings without making any projection in earnings "for which expert testimony was required." *Id.* In contrast, Donlin was only a temporary employee of Philips for a term of less than one year and did not develop in-depth knowledge of the company's salary structure, advancement opportunities, pay raises, or employment patterns. Therefore, her testimony cannot be considered within her personal knowledge and she does not qualify for the personalized knowledge exception.

In crediting Donlin's testimony, the District Court relied principally on *Paolella v. Browning-Ferris, Inc.*, 158 F.3d 183 (3d Cir. 1998). There, Paolella sued under Delaware law for wrongful discharge after he was fired for complaining about his company's illegal billing practices. *See id.* at 183-88. The jury found in his favor and awarded $135,000 in back pay and $597,000 in front pay. *Id.* at 188. The company contended there was insufficient evidence to support the jury's front pay award and argued that Paolella did not offer expert actuarial

13

testimony to support his claim. *Id.* at 194. Paolella had been terminated in early 1994, and presented evidence of his pre-termination salary from 1991 to 1993, as well as his post-termination earnings for 1995. *Id.* We found that based on this information, the jury "could reasonably calculate a front pay award according to the district court's instructions." *Id.* at 195. Accordingly, we held that we "do not believe the absence of expert testimony renders the jury calculation improper." *Id.*

Though *Paolella* might seem analogous to Donlin's case, the District Court's reliance thereon is problematic for two reasons. First, *Paolella* predated the 2000 amendment to Rule 701. That amendment added a new requirement for admissibility — subsection (c) regarding "technical" or "specialized" testimony — and we must question the vitality of *Paolella* in light of the additional requirement.

Second, the testimony offered in *Paolella* is distinguishable from Donlin's case. The only front pay testimony given in *Paolella* related to straightforward evidence of the plaintiff's salary as well as an estimate that the plaintiff would work for another 14 years, until age 65; there was no indication *Paolella* required the witness to undertake complicated tasks such as calculating life-expectancy, assessing amortization rates, estimating pay raises, discounting to present value, or calculating earnings potential in a pension portfolio.

In that regard, our more recent holding in *Eichorn v. AT&T Corp.*, 484 F.3d 644 (3d Cir. 2007), is more on point. There, a group of employees sued claiming a violation of their pension rights after their employer merged with a larger

company. *Id.* at 646-47. The plaintiffs failed to produce an expert witness on damages and instead relied on a report and testimony from plaintiffs' counsel's son. *Id.* at 648. The witness made various assumptions — much like those made by Donlin — including: when plaintiffs would have retired; how their salaries would have increased in the merged company; what choices the plaintiffs would have made with respect to pension benefits; and the life expectancy of each plaintiff. *Id.* at 648. We acknowledged that pursuant to *Lightning Lube* and *Maxfield*, expert testimony is "not always required to prove damages in cases where projected future earnings are part of the calculation," *id.* at 650 n.3, but explained that Rule 701 requires a lay witness to have a "reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses," *id.* at 649. Because the witness was testifying based on neither experience nor personal knowledge and the calculations required were "sufficiently complex," we concluded that the district court did not abuse its discretion in barring the lay testimony. *Id.*

In accordance with *Eichorn*, we find that the District Court should have barred portions of Donlin's testimony requiring technical or specialized knowledge. Donlin admitted that she was "not a professional," nor a finance major or forensic economist. Under the *Lightning Lube* exception, Donlin's testimony regarding facts within her personal knowledge (such as her current and past earnings) was appropriate. But, much of Donlin's testimony went beyond those easily verifiable facts within her personal knowledge and instead required forward-looking speculation for which she lacked the necessary training. For instance, in calculating her

15

front pay, Donlin speculated that Philips would provide a 3% annual pay raise; in fact, the company did not provide an increase of more than 1.3% in the years immediately prior to the trial. Additionally, having no experience with retirement benefits, Donlin misinterpreted Philips's definition of "pensionable earnings" and erroneously assumed a flat 5% per year on pension earnings based only on an example in the Philips pension manual. After admitting that she had never performed a present-value discounting calculation prior to the day before trial, Donlin testified that she received instructions from her lawyer the night before regarding the proper discount rate.[5] Finally, Donlin misapplied the life expectancy charts and therefore did not properly account for the probability of her death.

In sum, Donlin's testimony crossed the line into subject areas that demand expert testimony. Specifically, we find that Donlin's testimony regarding the pension component of her back pay damages was improper.[6] On the issue of front pay,

[5]The District Court's memorandum on damages suggests that discounting is best left to experts. In performing its own calculation, the District Court explained: "Some disagreement exists even among experts as to the methodology used to discount an award to present value." *Donlin v. Philips Elec. N. Am. Corp.*, No. 3:05-CV-0585, 2007 WL 1238541, at *3 n.5 (M.D. Pa. Apr. 26, 2007) [hereinafter Damages Memorandum].

[6]There were two components of Donlin's back-pay award: lost wages and lost pension earnings. While we approve

16

Donlin's lay testimony was inappropriate with regard to her estimate of the annual pay raises at Philips, her estimated pension value, and the discounts she made for the probability of death and to find the present value of the award. Because this testimony was of a specialized or technical nature and was not within Donlin's personal knowledge, the District Court abused its discretion in allowing her to offer it. A trial judge must rigorously examine the reliability of a layperson's opinion by ensuring that the witness possesses sufficient specialized knowledge or experience which is germane to the opinion offered. *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1200-01 (3d Cir. 1995). Here, the District Court erred in that regard.

Furthermore, it is readily apparent that this error was not harmless. *See Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 228 (3d Cir. 2008). Donlin's improper testimony constituted a significant share of the damages evidence presented at trial, and we cannot find that it is "highly probable" that the erroneous admission of her testimony did not contribute to the damages award. *See Advanced Med., Inc. v. Arden Med. Sys., Inc.*, 955 F.2d 188, 199 (3d Cir. 1992). Accordingly, we will vacate the judgment of the District Court in this regard and remand for a new trial on damages.

---

of Donlin's testimony with regard to her lost wages, we find that the District Court improperly credited Donlin's testimony that she lost $9,453 in back pension benefits.

B.

In light of our decision to remand for a new trial on damages, we will address the remainder of Philips's arguments to provide guidance to the District Court.

First, Philips contends that Donlin should not be entitled to compensatory damages because she found better employment after Philips refused to hire her. We must address both back pay and front pay.

1. Back Pay

Back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination. *See Loeffler v. Frank*, 486 U.S. 549, 558 (1988). Section 706(g) of the Civil Rights Act of 1964, which governs back pay awards in Title VII cases, provides:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice . . . the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include . . . any other equitable relief as the court deems appropriate . . . . Interim earnings or amounts earnable with reasonable diligence by the person or persons

18

discriminated against shall operate to reduce the
back pay otherwise allowable.

42 U.S.C. § 2000e-5(g).

Back pay is not an automatic or mandatory remedy, but
"one which the courts 'may' invoke" at their equitable
discretion. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415
(1975); *see also Waddell v. Small Tube Prods., Inc.*, 799 F.2d
69, 78 (3d Cir. 1986). When a plaintiff finds employment that
is equivalent or better than the position she was wrongly denied,
the right to damages ends because it is no longer necessary to
achieve an equitable purpose; the plaintiff at that point has been
restored to the position she would have been in absent the
discrimination. *See Ford Motor Co. v. EEOC*, 458 U.S. 219,
236 (1982).

Philips contends that back pay damages are not required
because Donlin obtained full-time employment with another
company, Romark Logistics, eight months after her employment
with Philips ended. Donlin worked at Romark Logistics from
September 2003 until August 2005 before voluntarily leaving to
take a position at Mission Foods. Her employment at Mission
Foods continued through the trial. Philips asserts that Donlin's
work at Romark restored her to the position she would have
been in absent the alleged discrimination, and her back pay
should terminate at the time she was rehired.[7]

---

[7]Philips concedes that, given our affirmance of the
adverse liability verdict, back pay is appropriate for the eight

19

In light of the facts found by the District Court, we disagree because Philips understates the requirements for an award of back pay and, as a result, comes to a legal conclusion that is inconsistent with the District Court's findings of fact. Those findings of fact are no longer valid, however, because the numbers used by the District Court were based on improper testimony. Our analysis is nonetheless illustrative and should guide the District Court on remand.

From a legal perspective, the fact that Donlin found a job is insufficient by itself to demonstrate that she reestablished herself in the workplace such that she should be ineligible for back pay damages; the law requires that she find new employment that is "better or substantially equivalent." *Ford Motor*, 458 U.S. at 236. "Substantially equivalent" employment affords "virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Booker v. Taylor Milk Co.*, 64 F.3d 860, 866 (3d Cir. 1995).

The District Court found, *as a matter of fact*, that Donlin would have made $182,923 working for Philips from the time of her termination until the time of trial and that she lost pension earnings in that same period in the amount of $9,453 for a total of $192,376. Damages Memorandum at *3. During that same time period, the District Court found that Donlin's actual

---

months between the date Philips terminated Donlin and the date Romark hired her.

20

earnings were $129,326.  *Id.*[8]  Comparing the two figures, the District Court concluded *as a matter of law*, that Donlin suffered a back pay loss of $63,050 "based on the difference between the amount she earned from her discharge until the time of trial and

---

[8]The District Court presented this factual finding as a lump sum for the entire back-pay period.  It would have been helpful had the District Court broken down its analysis among three phases: Donlin's period of unemployment (January to August 2003); her term of employment at Romark (September 2003 to August 2005); and her term of employment at Mission Foods (September 2005 to trial).  We must compare Donlin's putative earnings at Philips to her actual earnings at Romark for the purpose of considering whether the Romark job was substantially equivalent; if the job at Romark was substantially equivalent to Philips, then Donlin's compensatory damages should have ceased in August 2003 when she was hired by Romark regardless of whether she subsequently earned a lower salary at Mission.

Although the District Court provided a lump sum amount, we are able to extrapolate Donlin's earnings at each phase of employment from Donlin's trial exhibits, which were accepted by the District Court with minimal deviation.  In doing so, we observe that Donlin's compensation at both Romark and Mission fell short of what she would have earned at Philips over that time period. Additionally, for reasons discussed in Section III.C, *infra*, we are convinced that the jobs at Romark and Mission are substantially equivalent with one another.  On remand, however, the District Court should be more explicit with its findings and compare Donlin's putative earnings at Philips to her actual earnings at Romark alone in order to gauge whether she found substantially equivalent employment.

21

the approximate amount she would have earned . . . had she remained at Philips." *Id.*

Philips asserts that Donlin received greater compensation than she would have received had she been hired by Philips because she worked overtime hours in her new job and received a greater annual pay raise than the raises given by Philips. *Id.* The District Court's undisputed factual findings at the first trial do not comport with this conclusion, however. Instead, they indicate that Donlin earned less in her new job, even taking into account her overtime compensation and pay raise.[9] These facts supported a finding that the two jobs were not substantially equivalent. If the evidence on remand supports a similar finding, the District Court should again conclude as a matter of law that Donlin can only be made whole — as Title VII demands — if awarded sufficient back pay to make up the difference.

## 2. Front Pay

Though back pay makes a plaintiff whole from the time of discrimination until trial, a plaintiff's injury may continue thereafter. Accordingly, courts may award front pay where a

---

[9]Philips claims it "does not dispute the district court's findings of fact," but disputes only the "failure to apply the law to those facts." Based on our understanding of the trial exhibits and the District Court's findings, however, Philips's claim that Donlin received greater compensation at Romark than she would have at Philps is a factual claim that was rejected at trial.

22

victim of employment discrimination will experience a loss of future earnings because she cannot be placed in the position she was unlawfully denied. *See Maxfield,* 766 F.2d at 795-97. Front pay is an alternative to the traditional equitable remedy of reinstatement, *Squires v. Bonser*, 54 F.3d 168, 176 (3d Cir. 1995), which would be inappropriate where there is a likelihood of continuing disharmony between the parties or unavailable because no comparable position exists. *See Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987); *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 890 (3d Cir. 1984). Because the award of front pay is discretionary, we review the District Court's decision for abuse of discretion and will reverse only if we are left with a definite and firm conviction that a mistake has been committed. *See In re Cohn,* 54 F.3d 1108, 1113 (3d Cir. 1995); *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 832 (3d Cir. 1994).

The jury recommended a front-pay award of $395,795 to cover the difference in Donlin's salary and pension earnings for 25 years, adjusted to account for the probability of death and discounted to present value. The District Court modified that award, limiting front pay damages to 10 years, which totaled $101,800. Despite this reduction, Philips asserts that the District Court's award of front pay was erroneous in two respects.

First, Philips claims that Donlin should not be entitled to front pay because she mitigated her damages by reestablishing herself in the workforce before trial. Philips cites *Ford Motor* for the proposition that damages are inappropriate where they "would catapult [the plaintiff] into a better position than they would have enjoyed in the absence of discrimination." 458 U.S.

23

at 234. As we have explained, however, the District Court found that Donlin was *not* in the same position she would have been in had Philips hired her as a full-time employee. Instead, the District Court concluded that her salary would have been higher had she been hired and remained at Philips.[10] When a defendant's front pay objection is predicated upon the same objections regarding mitigation of damages which we have rejected with regard to back pay, we reject the front pay argument as well. *See Goss*, 747 F.2d at 890.

Second, Philips asserts that an award of front pay based on a 10-year period was inappropriate because it involved speculation regarding market conditions, Donlin's future earnings, and her length of employment. The District Court agreed with this argument in part when it reduced the advisory jury's award of front pay from 25 years to 10 years. Damages Memorandum at *3 ("An award of front pay until retirement at age 65, a twenty-five year period, would be too speculative."). Philips contends that the time period is still too long, noting that

---

[10]As we noted *supra*, the District Court's findings regarding Donlin's future salary were based on improper testimony. If the District Court finds on remand, considering the new damages evidence, that the job Donlin held at Romark was not substantially equivalent to or better than the job she would have held at Philips, then the following analysis regarding the proper length of the front-pay damages period will be applicable in the second trial. By contrast, if the District Court finds that Donlin's Romark job was substantially equivalent or better than the job she would have held at Philips, then front pay would be unwarranted because Donlin would have mitigated her damages.

24

the Mountaintop facility where Donlin was employed is subject to unpredictable market conditions — including adjustments in demand and the availability of exclusive contracts with major suppliers — which cannot be accurately estimated for 10 years.

Because a claimant's work and life expectancy are pertinent factors in calculating front pay, *Anastasio v. Schering Corp.*, 838 F.2d 701, 709 (3d Cir. 1988), such an award "necessarily implicates a prediction about the future." *Dillon v. Coles*, 746 F.2d 998, 1006 (3d Cir. 1984). Accordingly, we will not refuse to award front pay merely because some prediction is necessary. *Green v. USX Corp.*, 843 F.2d 1511, 1532 (3d Cir. 1988), *vacated on other grounds*, 490 U.S. 1103 (1989), *reinstated in relevant part*, 896 F.2d 801, 801 (3d Cir. 1990). Instead, we allow the District Court to exercise discretion in selecting a cut-off date for an equitable front pay remedy subject to the limitation that front pay only be awarded "for a reasonable future period required for the victim to reestablish her rightful place in the job market." *Goss*, 747 F.2d at 889-90.

In *Goss*, the plaintiff complained that the District Court cut off her front pay after just four months, arguing that front pay should be extended because she was unlikely to earn as much money in her new sales job. 747 F.2d at 890. Goss's earnings were commission-based and her commissions were likely to be lower in her new position given her lack of familiarity with her new employer's products. *Id.* Accordingly, Goss argued that her front pay should be extended even though she found new employment. *Id.* We disagreed, finding that the question whether Goss would be less successful in her new job required unreasonable speculation regarding future market

25

conditions and the company's success. *Id.* Therefore, we declined to lengthen the front pay damages period. *Id.* at 891.

In *Green*, however, we distinguished *Goss* and imposed a two-year front pay award for a class of plaintiffs asserting discrimination in the hiring process of a Pennsylvania steel company. 843 F.2d at 1532. Because the plaintiffs presented evidence for the period immediately following trial, we found that calculating front pay damages based on a two-year period was a "reasonable compromise" and not "wild speculation" because it would help offset future harm that "would *certainly* be caused" by past discrimination. *Id.* (emphasis in original).

Though the 10-year damages period granted by the District Court exceeds that awarded in *Green*, we note that there will often be uncertainty concerning how long the front-pay period should be, and the evidence adduced at trial will rarely point to a single, certain number of weeks, months, or years. More likely, the evidence will support a range of reasonable front-pay periods. Within this range, the district court should decide which award is most appropriate to make the claimant whole. *See*, *e.g.*, *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 1000-01 (10th Cir. 2005); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir. 1996).[11]

---

[11]The District Court was not required to submit the issue of front pay to the advisory jury in the first place because a bench trial is sufficient to determine an equitable award such as front pay. *See, e.g., Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666 (6th Cir. 2008).

Such an exercise of discretion may result in an award different from what one or both of the parties would prefer. This possibility is caused by the inexactness of predictive evidence for front pay, and our standard of review (abuse of discretion) grants considerable leeway to district courts to grant an award that best serves Title VII's remedial purpose.

We have not yet spoken precedentially regarding the precise length of time that is appropriate for an award of front pay. Indeed, in one case, a front-pay award of *X* years may be appropriate, while on different facts, a front-pay award for that same term of years would be inappropriate. These decisions are left to the sound discretion of the district court and every case must be considered on its particular facts. We note, however, that other courts of appeals have affirmed front-pay awards of 10 years or more. *See, e.g., Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 79 (2d Cir. 2004) (affirming a district court's award of front pay for 9-12.5 years to victims of age discrimination), *vacated on other grounds sub nom KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 574 (7th Cir. 1995) (10-year front pay award did not constitute an abuse of discretion); *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993) (same). Additionally, we note that in *Blum*, we held that awarding front pay until plaintiffs' projected retirement in eight years did not require unreasonable speculation. 829 F.2d at 376. We see no reason why a front pay award for eight years would be proper, but an award for 10 years constitutes an abuse of discretion. This is especially true here, where an advisory jury recommended front pay for 25 years.

27

Accordingly, we find that the District Court did not abuse its discretion when it awarded Donlin front pay for 10 years.

## C.

Philips next argues that the District Court erred in calculating the amount of compensatory damages in light of Donlin's subsequent employment decisions. In September 2003, eight months after Philips declined to hire her, Donlin found employment at Romark Logistics where she worked for nearly two years. In August 2005, Donlin voluntarily left Romark for a position at Mission Foods because it was closer to her home. Philips contends Donlin's transfer to a lower-paying job at Mission was inconsistent with her duty to mitigate damages and the District Court erred by forcing Philips to suffer the decrease in Donlin's wages in the form of increased compensatory damages. This argument is inconsistent with the record.

Damages are reduced under Title VII for "interim earnings or *amounts earnable with reasonable diligence* by the person or persons discriminated against." 42 U.S.C. § 2000e-5(g)(1) (emphasis added). The availability of an equivalent or better job "terminates the ongoing ill effects" of the defendant's discriminatory action, so the right to damages ends when such an opportunity becomes available. *Ford Motor*, 458 U.S. at 234. To hold otherwise, the Supreme Court reasoned, would "requir[e] a defendant to provide what amounts to a form of unemployment insurance . . . ." *Id.* at 235. The burden falls on the defendant employer to prove a failure to mitigate by demonstrating that substantially equivalent work was available,

28

and that the claimant did not exercise reasonable diligence to obtain it.  *Le*, 321 F.3d at 407.

Our sister circuit courts of appeals have held that one must make "reasonable efforts" to mitigate her loss of income, and only unjustified refusals to find or accept other employment are penalized.  *NLRB v. Arduini Mfg. Co.*, 394 F.2d 420, 422-23 (1st Cir. 1968).  An employee need not seek employment "which involves conditions that are substantially more onerous than [her] previous position."  *NLRB v. Madison Courier, Inc.*, 472 F.2d 1307, 1320-21 (D.C. Cir. 1972).  Notably, the employee is not required to accept employment which is located an unreasonable distance from her home.  *Id.* at 1314.  "It is well settled that a claimant has not failed to make a reasonable effort to mitigate damages where [she] refused to accept employment that is an unreasonable distance from [her] residence."  *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 625 (6th Cir. 1983).

Philips argues that Donlin's 32-mile commute to Romark was not unreasonable and that many of the employees Donlin worked with at Philips commuted even farther.  Because the commute to Romark was not unreasonable, Philips contends, Donlin failed to mitigate her damages by voluntarily accepting a lower-paying position at Mission.  We disagree because simple math reveals that Donlin's decision to work closer to home did not constitute a failure to mitigate.  When Donlin left Romark, she was making $14.70 per hour, but when she moved to

29

Mission, she was making only $13.00 per hour.[12] Despite the wage differential between the positions at Romark and Mission, when factoring the increased cost of Donlin's commute to Romark into her overall compensation, we find that the positions were substantially equivalent and, therefore, Donlin's decision to take a lower-wage job at Mission was reasonable.[13]

---

[12]Donlin's wages increased by 3.9% in her second year at Mission, or up to $13.51 per hour. At that time, Philips employees received $14.67 per hour as a base salary.

[13]Donlin's temporary position at Philips required a commute of less than 10 miles each way. By contrast, Romark was about 32 miles away, resulting in an increased daily commute of 44 miles round-trip. Donlin then voluntarily chose to leave Romark because Mission was located 20 miles closer to her home. The going mileage rate on the federal tax return for 2003 was 36 cents per mile. *See* Rev. Proc. 2002-61, sec. 5, 2002-2 C.B. 616, 618. Given an additional 44 miles per day between Philips and Romark, Donlin's commute was $15.84 more costly per day. Donlin's transfer to Mission, however, reduced her commute by 40 miles per day, making it approximately $14.40 cheaper. As noted above, Donlin earned about $1.70 less per hour in her first year at Mission compared to what she was making at Romark and about $1.20 less per hour in her second year. Therefore, assuming an eight-hour work day, Donlin was earning at most $13.60 less per day at Mission than at Romark ($1.70 x 8 hours); after she was given a raise in her second year at Mission, the difference was just $9.60 less per day. Both figures are less than the additional cost

Pursuant to our holding in *Le*, Philips was required, as the discriminating party, to demonstrate that substantially equivalent work was available, and that Donlin did not exercise reasonable diligence to obtain such employment. *See Le*, 321 F.3d at 407. Though we review the calculation of back pay for abuse of discretion, a finding that a Title VII claimant has exercised reasonable diligence in seeking other suitable employment following a discriminatory discharge is an issue of fact which, on appeal, is subject to a "clearly erroneous" standard of review. *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 156 (3d Cir. 1999); FED R. CIV. P. 52(a). The foregoing analysis illustrates that the job at Mission constituted a "substantially equivalent" opportunity as that available at Romark. Donlin should not be penalized for accepting that opportunity. Accordingly, the District Court's finding that Donlin sufficiently mitigated her damages was not clearly erroneous and the District Court did not err with regard to this issue.

## D.

Philips's final assignment of error regards the District Court's use of an inappropriate comparator to determine the compensation Donlin would have earned had she been hired by Philips. In calculating Donlin's compensatory damages, the District Court compared the wages she received in her subsequent employment to what she would have earned had she been hired at Philips. In estimating what Donlin's salary would have been at Philips, the court allowed Donlin to use the wages

to commute.

earned by Martha Matusick, a Philips employee with 15 years tenure, as her basis of comparison. Philips asserts this was erroneous because Donlin ignored the salaries of the male employees hired in her stead. We disagree.

We have held that for the purpose of determining *liability* in discrimination suits, a plaintiff "cannot selectively choose a comparator." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). In *Simpson*, the plaintiff relied solely on one employee as a comparator in arguing that she was treated less favorably than her colleagues. *Id.* at 646. We held that Simpson's approach was too narrow and that she "cannot pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she." *Id.* at 646-47. Though *Simpson* concerned comparisons for the purpose of determining liability, we find that principle applicable in the damages context as well. Thus, we agree that Donlin could not "pick and choose" a damages comparator; rather, a Title VII plaintiff must choose similar employees against whom to compare herself.

Under that principle, we disagree that Matusick was an inappropriate basis of comparison. Although Matusick was long-tenured, the record evidence shows that Philips did not increase its employees' salaries based on seniority. Additionally, there was evidence that Donlin and Matusick worked the same shift and worked similar amounts of overtime, both of which were key factors affecting compensation. Indeed, the District Court found as a matter of fact that Matusick was "an average employee with similar work habits and pension

information." Damages Memorandum at *3. Furthermore, the nine men Philips hired in lieu of Donlin would not have made good comparators because of their idiosyncratic employment histories. Specifically, the record shows that the men had quit, died, refused overtime, worked on different shifts, or had long periods of disability. Accordingly, on remand the District Court may determine Donlin's compensatory damages by comparing her to Matusick or any other Philips employee with similar characteristics.

IV.

Finally, the parties dispute the amount of attorney's fees awarded to Donlin as the prevailing party in this case. Donlin filed a motion for attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and Federal Rule of Civil Procedure 54(d), seeking $79,446, a fee multiplier of 25%, and costs in the amount of $6,195, for a total of $107,052. The District Court granted Donlin's motion in part and denied it in part, awarding a total of $75,818 in fees and costs. Philips argues that the award was overly generous, whereas Donlin argues that the award was not high enough. We review the grant of attorney's fees for abuse of discretion. *See P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Philips contends that Donlin was not entitled to attorney's fees because she failed to submit sufficient supporting evidence. *See Rode v. Dellaciprete*, 892 F.2d 1177, 1183-84 (3d Cir. 1990). Donlin's submission in this case consisted of a list of tasks performed by her attorney and his paralegal and a citation to her attorney's work in another civil rights case, *Potence v.*

33

*Hazelton Area School District*, 357 F.3d 366 (3d Cir. 2004), in which the court determined that $200 per hour was a reasonable rate in the relevant market. Although these submissions fall well short of best practices — which would entail a comprehensive petition for fees in each case — we do not find that the District Court abused its discretion by approving the $200 hourly rate.

On the other hand, we summarily reject Donlin's counsel's attempt to extract an additional $25 per hour without providing additional documentation. The party seeking an award of fees must justify the hourly rates of counsel and Donlin has failed to do so. *See Maldonado v. Houstoun*, 256 F.3d 181, 184-85 (3d Cir. 2001). Additionally, the District Court properly rejected Donlin's request for a fee multiplier in light of her attorney's self-proclaimed "excellent result." Such multipliers are appropriate "only in very rare circumstances where the attorney's work is so superior and outstanding that it far exceeds the expectations of clients and normal levels of competence." *Rode*, 892 F.2d at 1184. The party seeking the upward adjustment has the duty to present specific evidence as to what made the result so "outstanding" and why the ordinary amount requested was "unreasonable." *See Pennsylvania v. Del. Valley Citizens Council for Clean Air*, 478 U.S. 546, 567-68 (1986). Here, there is no evidence that Donlin's attorney did anything more than was required to win the case. Therefore, the District Court did not abuse its discretion in denying Donlin's request for a multiplier.

Accordingly, we will affirm the District Court's award of attorney's fees.

34

## V.

In sum, we find no reversible error regarding the District Court's instructions to the jury, so we will affirm the judgment on liability. Nor was the District Court's judgment regarding attorney's fees erroneous. We find reversible error, however, regarding the District Court's admission of testimony that required specialized or technical expertise. This improper testimony affected the District Court's well-reasoned judgment with regard to mitigation as well as the amount of damages. Accordingly, we will vacate the judgment and remand for a new trial on damages